# Lynch *v.* Troxell, Appellant.

### Waters—Dam—Flooding land.

The extent of a presumed grant to swell water upon the land of an adjoining owner is measured by the land actually flooded, and not by the height of the dam by which the swelling is occasioned. If, by means of repairs to a dam, the land be flooded to a greater ·extent than it had been for twenty-one years before, the owner of the dam is liable for the injury, although the height of the dam may not have been increased.

This rule is not confined to mere repairs of a dam. If a new one replaces an old one, and in its construction there is such a change that the water is forced back to a greater extent than it had been for a period of twenty-one years by the old dam, the owner of the dam is liable for the injuries sustained, although the height of the new dam may not have been increased, but, as a matter of fact, may even be lower than the old one.

### Waters—Flooding land—Measure of damages.

In an action of trespass by an upper riparian owner against a lower riparian owner to recover damages for injuries sustained by reason of the construction of a dam, the measure of damages is, in addition to the value of trees or shrubbery actually destroyed, the cost of restoring plaintiff's property to its condition before it was injured, unless such cost should equal or exceed its value, in which event the value would be the measure of damages, to which cost of restoration should be added the actual loss sustained by being deprived of the full use of the property from the time the injury was committed up to the institution of the suit.

### Waters—Flooding land—Damages—Punitive and exemplary damages.

In an action to recover damages for the flooding of land, the jury cannot award punitive damages unless there is evidence that the injuries complained of were committed wilfully, maliciously, or so negligently as to indicate a wanton disregard of the rights of others.

### Trespass—Boundaries—Low water mark—Charge.

In an action of trespass for injuries to land by reason of flooding from a lake, where plaintiff's deed shows that her land extended to a point on the shore of the lake "twenty feet above low water mark, thence along the said shore about twenty feet above low water mark to a point," etc.,

it is proper for the court to charge that plaintiff's ownership extended at most only to a line parallel with low water mark and twenty feet distant therefrom, and that the jury must find where low water mark was, and where the twenty foot line was.

*Waters—Abutting land—Agreement—Admission—Evidence.*

In an action of trespass to recover damages for the flooding of land, the plaintiff may offer in evidence an agreement in writing made with the defendant by which the latter admitted that he had constructed a dam, and agreed in consideration of general release to lower the dam so as to prevent an overflow of plaintiff's lands.

*Trespass—Expert witness—Incompetent witness—Waters.*

In an action to recover damages for the flooding of land, a witness who has no acquaintance with the properties in the vicinity should not be permitted to express an opinion as to values.

Argued April 13, 1903.   Appeal, No. 190, Jan. T., 1902, by defendant, from judgment of C. P. Luzerne Co., Oct. T., 1899, No. 363, on verdict for plaintiff in case of Mary C. Lynch v. Ephraim Troxell.   Before MITCHELL, DEAN, FELL, BROWN and MESTREZAT, JJ.   Reversed.

Trespass to recover damages for flooding land at Harvey's lake.   Before SAVAGE, P. J., specially presiding.

At the trial it appeared that in July, 1895, the plaintiff bought a farm at Harvey's lake for $2,000, composed of three pieces.   One of these containing about three acres, was bounded on the lake side as follows: " thence to a point on the shore of Harvey's Lake twenty feet above low water mark, thence along the said shore about twenty feet above low water mark to a point," etc.

In the same year, the defendant replaced an old wooden dam which had been at the outlet of the lake for thirty years by a new masonry dam which was built six inches lower than the old dam and afterwards lowered six inches more by the removal of two cap stones, making it a foot lower than the old dam.   Both dams were on land owned by the defendant and were built for regulating the water in the creek at the outlet of the lake for the use of defendant's mill lower down.

The plaintiff claimed that the new dam, being tighter than the old and having a smaller gate, held the water of the lake back more uniformly high than the old, and kept the plaintiff's land under water longer each year than formerly.   This was denied by defendant's witnesses.

The court admitted under objection and exception an agreement in writing between plaintiff and defendant as follows:

" Memorandum of agreement made in duplicate this 14th day of May, A. D. 1897, between Mrs. Mary C. Lynch, party of the first part, and Ephraim Troxell, party of the second part, both of the city of Wilkes-Barre, Luzerne county, Pennsylvania.

" Whereas, the said Troxell has erected at the outlet of Harvey's Lake a stone dam, which has caused the overflow of certain lands belonging to the said party of the first part, being the third piece of land described in deed of Jacob P. Sorber to James L. Lenahan, dated August 13, 1892, and recorded in deed book No. 344, page 77, and containing two and 13–160 acres:

" Now this agreement witnesseth: That the said party of the first part hereby releases and forever acquits the said Troxell from all claims for damages to this date caused by the overflowing of the said lands by reason of the erection of the dam aforesaid.

" In consideration whereof the said Troxell agrees to open the gate at said dam immediately, and to lower the waters of the lake to a point at least eighteen inches below the present overflow of said dam within one month from this date: And the said Troxell further covenants and agrees, for himself, his heirs, and assigns to keep the waters of Harvey's Lake down to at least eighteen inches below the present overflow of said dam, until the height of said overflow, as the same is now constructed, shall be cut down at least eighteen inches; and thereafter not to maintain the said dam with an overflow of any greater height.

" It is understood and agreed between the said parties that the foregoing covenant shall run with and be appurtenant only to the land above described."

The said Troxell further agrees to repair the wall erected on the land aforesaid on the lake side, and to place the same in as good condition as when originally built before the end of the coming summer. [13]

Defendant presented this point:

6. By the undisputed evidence, plaintiff's ownership of the " three acre " piece of land lying between the road and the lake

extended at most only to line parallel with low water mark and twenty feet distant therefrom. *Answer :* I affirm their sixth point, and say to you by the undisputed evidence, plaintiff's ownership of the "three acre" piece of land lying between the road and the lake extended at most only to line parallel with low water mark and twenty feet distant therefrom. But you must find where low water mark is and where that twenty foot line was, as I have explained to you in the general charge. [6]

The court charged in part as follows:

If the line is where the plaintiff says it is, down about the stone wall, in that neighborhood, and low water mark is some seventy-five or one hundred feet further out, east of the stone wall, then Mrs. Lynch would own at least a part of the shore ; she would own beyond high water mark. While it is conceded in this case that there is twenty feet between low water mark and Mrs. Lynch's line, yet if it be true as contended by the plaintiff that that is a part of the shore—that strip of land between high and low water mark—then while she would not own and does not own down to the low water mark of the lake, yet she would have the rights of the general public, such rights as the general public would have to the use of that shore which for all purposes of boating and use of the lake as a public highway, would be as ample as though she were the owner to low water mark. The owner of the shore or the strip between high and low water mark along the banks of a stream declared a public highway, owns it subject to the right of the general public to use it for all legitimate purposes connected with the use of the body of water thus declared a public highway as I understand the law. The public would have no right to dig up the ground, to carry anything away, or to use it in any other way then legitimately as connected with the use of the lake or stream. So you see a good deal depends upon where that line is. If Mrs. Lynch's line comes down to the point between high and low water mark, then notwithstanding there is twenty feet between her line and low water mark, she together with the general public have a right to the use of that land for any legitimate purposes connected with the enjoyment of the lake as a public highway. I leave it with you to find where that

line is from all the testimony in this case. You might find, if she has a right to the use with the general public of that twenty-foot strip of land, that her front would be practically worth as much to her as though she owned the twenty feet, for all the purposes for which this land is said to be available and valuable, that is, summer residence purposes; or you might find that though it would not be quite as valuable to her, yet it would certainly be much more valuable than if she had no right to the use of the twenty feet between her and the lake, because she was back beyond the high water mark and her line did not reach over to the shore. I think you understand what I mean by that. If there was a strip of land between her front, the front of her property, and the lake over which she would have no right to go, over which the general public had no right to go, the land would probably be very much less valuable than if her line extended to a point between high and low water mark, or to high water mark, so that all that was owned between her and the low water mark would be what is termed shore, namely the space between high and low water mark to which the general public has a right on a navigable stream.] [7]

[If you conclude that this land of Mrs. Lynch's extends to below high water mark and is practically lake front to her, that there is nothing between her and the strip of land to which the general public have the use of for purposes in connection with the use of the lake for a public highway, then you will determine what that land was worth for building purposes, or any purpose which it could be put to by her in the way of making use of it for summer residence or for building lots for summer residences what it was worth before it was affected by the flooding complained of and what it is worth in its present condition for the purpose of enabling you to determine what the whole property was worth before the injury complained of, and then determine what the whole property is worth since the flooding or since the injury complained of, in order to enable you to determine what is the damage to the property, the direct damages to the property.] [8]

[Then if you conclude that the damage to the land as a whole is less than it would cost to remedy the injury, namely, to fill it up so as to put it in practically the same condition it

was before this flooding, that would be the measure of damages —the difference in the value of the property before it was flooded and the value of the property after it was flooded. But if you conclude that it could be put in the condition it was before the flooding for less money than this difference in value, then the cost of putting it in that condition would be the damages, providing you find the damages are permanent, because there is another principle applicable here. If you conclude that this obstruction in the dam is not permanent, and that the waters of the lake will not be kept at that point permanently and that this injury is not a permanent injury, then the damages would not be measured in that way, but Mrs. Lynch would be entitled only to receive such damages as she had actually sustained up to the time of the bringing of the suit.] [9]

Verdict and judgment for plaintiff for $7,000, actual $4,000, punitive $3,000. Defendant appealed.

*Errors assigned* among others were (6–9) above instructions, quoting them; (13) admission of agreement as above, quoting it; (14–24) various rulings on evidence referred to in the opinion of the Supreme Court.

*J. B. Woodward*, of *Woodward, Darling & Woodward*, with him *H. A. Fuller*, for appellant.—Having a prescriptive right to maintain the dam, the defendant had the right to repair or replace it so long as he made the new dam no higher than the old: Cowell v. Thayer, 46 Mass. 253; Ray v. Fletcher, 66 Mass. 200; Jackson v. Harrington, 84 Mass. 243; Gehman v. Erdman, 105 Pa. 371; McGeorge v. Hoffman, 133 Pa. 381.

The only damages for which the plaintiff can recover in this suit are for the season of 1899 up to July 7, the date of bringing suit. There is no testimony of any specific damage in that time: McGettigan v. Potts, 149 Pa. 155; Eshleman v. Martic Twp., 152 Pa. 68.

The rule is the cost of restoration unless that exceeds the value of the property: Robb v. Carnegie, 145 Pa. 324; Lentz v. Carnegie, 145 Pa. 612; Elder v. Lykens Valley Coal Co., 157 Pa. 490; Keiser v. Mahanoy City Gas Co., 143 Pa. 276; Noonan v. Pardee, 200 Pa. 474; James v. Sterrett, 4 Pa. C. C. Rep. 584.

The qualification annexed to the affirmance of the sixth point, entirely deprived the defendant of the benefit, on the question of damages, flowing from the conceded circumstance that plaintiff's ownership extended at most to a line twenty feet from low water mark.

The title of the riparian owner derived by grant from the state extends to low water mark, not absolutely, indeed, in tidal streams, but subject to the public right of passage when the tide is high : Tinicum Fishing Co. v. Carter, 61 Pa. 21–30.

*John M. Garman* and *Henry W. Palmer*, for appellee.—The question determining defendant's liability was not his right to maintain a dam but to back water upon Mrs. Lynch's property by raising the lake higher than it had before been maintained.

We deny that he had a right to raise the water to a greater height than its former and ordinary level as previously maintained : McGeorge v. Hoffman, 133 Pa. 381 ; Brown v. Bush, 45 Pa. 61 ; Jones v. Crow, 32 Pa. 398 ; Darlington v. Painter, 7 Pa. 473 ; Mertz v. Dorney, 25 Pa. 519 ; McCallum v. Germantown Water Co., 54 Pa. 40 ; Chestnut Hill, etc., Turnpike Co. v. Piper, 77 Pa. 432 ; Hogg v. Bailey et al., 5 Pa. Superior Ct. 426 ; Irving v. Media Boro., 10 Pa. Superior Ct. 132.

The fourth specification of error claims that the damages must be limited to such as were caused prior to July 7, 1899, the date of the institution of the suit. That would be so as stated by the court below in the opinion for a new trial if the damages were only temporary ; but if permanent the rule has always been to allow the full damages shown : Seely v. Alden, 61 Pa. 302 ; Marshall v. Am. Telegraph, etc., Company, 16 Pa. Superior Ct. 615.

Exemplary damages may be given in all cases of tort when the wrong inflicted is attended by circumstances showing a wanton disregard for the right of another : Amer v. Lonstreth, 10 Pa. 145 ; McCarthy v. DeArmit, 99 Pa. 63 ; Huling v. Henderson, 161 Pa. 553 ; Zimmerman v. Bonzar, 1 Mona. 341 ; Williams v. Esling, 4 Pa. 486 ; Keiser v. Mahanoy City Gas Co., 143 Pa. 276 ; Nagle v. Mullison, 34 Pa. 48 ; Kennedy v. Erdman, 150 Pa. 427.

A deed of conveyance which describes a line as running " to a stump near the creek and then up the creek north fourteen and one-half perches to a stone," etc., is to be construed as including all the land to low water mark of the creek: Klingensmith v. Ground, 5 Watts, 458 ; Naglee v. Ingersoll, 7 Pa. 185.

OPINION BY MR. JUSTICE BROWN, October 29, 1903 :

Under the undisputed facts in this case the right of the appellant to maintain a dam at or near the outlet of Harvey's lake cannot be questioned by the appellee ; but she does have a right to complain, if, in replacing the old one with the present, he caused the water to be forced back upon her land and subjected it to overflow from which it had not previously suffered. When he built the new dam in 1895, at or near the place where the old one had stood, it was not—taking into consideration the rights of the riparian owners—simply a question whether the new one should be no higher then the old, but whether it would be so constructed and maintained as to throw no more water back upon the lands of the appellee than had been forced there by the old. She would have had a right at all times to insist that the old dam should remain unchanged, if any change in it would have subjected her lands to increased flooding, and she has the same right to complain of the reconstruction of it, if there are changes in it which have produced the same result.

No express grant was shown to the appellant or his predecessors in title to force the water back to any definite or fixed height, and, his right being a prescriptive one, he must keep the water at the height at which it had been maintained for twenty-one years before the alleged injuries took place. The complaint of the appellee is, that the new dam is so constructed that the water is forced back upon her land to a greater height than it had been accustomed to flow during the maintenance of the old dam, the wasteway of which was twice, or more than twice, the capacity of that in the new one. If there is this change in the dam, and it has resulted in the injuries of which the plaintiff complains, she is entitled to recover. The instruction of the learned trial judge upon this point was correct.

The extent of a presumed grant to swell water upon the land of an adjoining owner is measured by the land actually flooded, and not by the height of the dam by which the swelling is oc-

casioned. If, by means of repairs to a dam, the land be flooded to a greater extent than it had been for twenty-one years before, the owner of the dam is liable for the injury, although the height of the dam may not have been increased: Mertz v. Dorney, 25 Pa. 519. This rule is not confined to mere repairs of a dam. If a new one replace an old one, and in its construction there is such a change that the water is forced back to a greater extent than it had been for a period of twenty-one years by the old dam, the owner of the dam is liable for the injuries sustained, although the height of the new dam may not have been increased, but, as a matter of fact, may even be lower than the old one. This may be regarded as settled with us, no matter what the authorities elsewhere hold. Nothing in the two cases to which we have been referred is in conflict with this. In the first, Gehman v. Erdman, 105 Pa. 371, it was proved by the defendant that for twenty-one years prior to the bringing of the suit, the dam "had been maintained in precisely the same form, and to the same and no greater height; that the structure was identically the same in all respects, at the time when the suit was brought, as it had been at any time during the twenty-one years prior to that time;" and the same member of the court who wrote the opinion, in commenting upon it in the second case—McGeorge v. Hoffman, 133 Pa. 381—said there was nothing to rebut the proof that the dam had been maintained in precisely the same form for twenty-one years prior to the bringing of this suit, and further stated: "It is certainly true that the presumption of a grant, arising from long continued user applies to the land occupied, and not to the dam, and the extent of the easement is measured by the extent to which the servient tenement is overflowed; but as long as the dam structure is of the same height, it may be assumed, in most cases at least, that the water is held to the same general level, and the extent of the land flooded from time to time is the same. The height of the water at what may be considered its ordinary level, as compared with known water marks, and the extent of land covered by the water at its ordinary stages from time to time, are proper evidence, of course, in this class of cases; but if it clearly appear that the dam-breast, through a period of twenty-one years prior to the time of the complaint, has been in fact unchanged, variations in the depth of the water,

during the continuance, after that, of the structure, at the same height, may be fairly attributed to the varying condition of the stream, or the evidence thereof to a difference of opinion as to what is the ordinary stage of the water. This is what we meant to say in Gehman v. Erdman, supra, and what was there said was applicable to the special facts of that case."

The injuries for which the appellee seeks compensation cannot, as a whole, be regarded as of a permanent character; for, if the appellant is guilty of the trespass charged against him, its continuance can be arrested after the appellee's right to do so has been established in this proceeding. It is true, some of the injuries of which she complains—for instance, the destruction of trees—may entitle her to compensation upon the basis of a permanent loss; but the compensatory damages to which she may be entitled, in addition to compensation for property actually destroyed, are such as will enable her to restore her property to its former condition after the cause of the trouble has been remedied, and pay her for having been deprived of the use of it up to the time suit was brought. In this suit she cannot recover for any damages sustained after its institution, for no notice of her intention to do so was given, as required by the Act of May 2, 1876, P. L. 95, and the jury should have been so instructed.

Under the instructions complained of in the eighth and ninth assignments of error, the jury may have found that the injuries were permanent and allowed damages upon that basis; if so, and this judgment is not disturbed, hereafter, at the suit of the appellee, or some one else, the appellant may be compelled to make the wasteway in the present dam what it was in the old, and, under the restored condition, the waters will recede and remain at a level that will do no harm to the appellee. In that event, more than likely to happen if a jury in the present proceeding should find the appellant to be a trespasser, the appellee might have her property restored to her in its former condition, with damages for permanent injuries probably several times what she actually ought to receive. Upon the assumption that, if she was being injured by the defendant, the injury would not be permitted to continue permanently, the measure of damages should have been clearly laid down as being, in addition to the value of trees or shrubbery

actually destroyed, the cost of restoring her property to its condition before it was injured, unless such cost should equal or exceed its value, in which event the value would be the measure of damages, to which cost of restoration should be added the actual loss sustained by being deprived of the full use of her property from the time the injury was committed up to the institution of the suit: Lentz v. Carnegie Bros. & Co., 145 Pa. 612; Eshleman v. Martic Township, 152 Pa. 68; Harvey v. Susquehanna Coal Co., 201 Pa. 63.

The question of defendant's liability to punitive damages was submitted to the jury, and there was a finding of $3,000 for his wanton injury of plaintiff's property. " The justification of exemplary damages lies in the evil intent of the defendant; and the allowance of such damages is, therefore, restricted to cases of wanton injury. There must be some wrong motive accompanying the wrongful act:" 1 Sedgwick on Damages, sec. 363. Compensatory damages are proper where there is no actual malice, and are such as indemnify the plaintiff, including injury to the property. Vindictive damages may be given where there is actual malice, to punish the defendant: Barnett v. Reed, 51 Pa. 190. " The general rule in cases for negligence is that only compensatory damages can be given. Juries are not at liberty to go farther than compensation, unless the injury was done wilfully or was the result of that reckless indifference to the rights of others which is equivalent to a violation of them. There must be wilful misconduct, or that entire want of care which would raise a presumption of conscious indifference to consequences:" Lake Shore & Mich. Southern Ry. Co. v. Rosenzweig, 113 Pa. 519. "In torts that are committed through mistake, ignorance, or mere negligence, the ordinary rule is mere compensation; but in such as are committed wilfully, maliciously, or so negligently as to indicate a wanton disregard of the rights of others, the jury are not restricted to compensation merely:" Pitts. C. & St. L. Ry. Co. v. Lyon, 123 Pa. 140. Applying the foregoing, out of the innumerable authorities upon the subject, to the testimony in this case, we can find nothing in it that would justify the submission of the question of exemplary damages to the jury. On the contrary, it seems to be conclusive that, when the appellant lowered the water, the inconvenience and annoyance to other riparian

owners and the menace to their health were so great that he would justly have incurred from them the charge of grossest indifference to their comfort and welfare if he had not again raised the water; and nothing said or done by him indicates the slightest wantonness towards the appellee, or any intention to wrong her. The jury should not have been permitted to punish him.

The sixth, seventh, eighth, tenth, eleventh and twelfth assignments are not sustained. They raise the question of the sufficiency of the proof of the title of appellee in the three-acre piece of land to the lake front, the contention of the appellant being that it does not extend so far, her deed calling for a point twenty feet from low water mark; and he produced a deed to himself for the intervening space of twenty feet. The whole question, however, was properly submitted in the answer to defendant's sixth point, which was: "I affirm their sixth point, and say to you by the undisputed evidence, plaintiff's ownership of the ' three-acre ' piece of land lying between the road and the lake extended at most only to line parallel with low water mark and twenty feet distant therefrom. But you must find where low water mark is and where that twenty-foot line was, as I have explained to you in the general charge." As to the Perigo triangle, the hemlock tree, one of the monuments on the ground, being on the lake side of the public road, it was for the jury to say whether the quitclaim deed from Abel Perigo to James Lenahan passed title to the land claimed by the appellee.

This suit is not in assumpsit on the agreement of May 4, 1897, but in trespass, for alleged wrongs of the defendant, committed as if the agreement had never been executed. True, the appellee could have sued the appellant on his broken covenant, but she was not bound to do so and not having done so, the agreement was properly admitted as an admission by the defendant that he had flooded her land. The thirteenth assignment is dismissed. The fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, nineteenth, twentieth, twenty-first, twenty-second, and twenty-third assignments relate to admission of alleged incompetent testimony. All of the witnesses were qualified to testify except Dr. Julian Czupka. He was not acquainted with the properties in the vicinity and, of course, had no knowledge of their value; he gave no

satisfactory reason for his opinion, and did not show that it rested upon a substantial foundation. His opinion was a mere guess, and, under all of our authorities, the latest being Friday v. Penna. Railroad Co., 204 Pa. 405, he ought not to have been allowed to express it. The twenty-second assignment is sustained. In view of what we have said on the subject of punitive damages, the twenty-fourth assignment is also sustained.

The only substantial errors committed on the trial were in the court's instruction as to the measure of compensatory damages and in submitting the question of punitive damages to the jury. The judgment is reversed and a new trial awarded, that, on it, the errors we have pointed out may be avoided.